488 P.2d 184

Guy Peter DUHAME and Daniel L. Blanton,
dba Sky-Hi Retreat Subdivision,
Appellants,

v.

NAVOPACHE ELECTRIC COOPERATIVE,
INC., an Arizona corporation,
Appellee.

No. I CA–CIV 1469.

Court of Appeals of Arizona,
Division 1.

Sept. 2, 1971.

Rehearing Denied Oct. 14, 1971.

Review Denied Nov. 16, 1971.

Cox & Hedberg, by John C. Hedberg, Phoenix, for appellants.

Earl Platt, St. Johns, for appellee.

KRUCKER, Chief Judge.

Appeal by plaintiffs below from a judgment dated June 24, 1970, on a contract for electrical services by the defendant, Navopache Electric Cooperative, Inc., to plaintiffs' subdivision, Sky-Hi Retreat Subdivision. The subdivision contained a total of 233 lots and the judgment held the defendant was only required to construct

power lines to the boundary of the subdivision and that any extension of feeder lines within this subdivision would require advance payment by plaintiffs for the cost of the lines in accordance with defendant's line extension policy or policies.

The question presented to this court is whether a public utility may refuse to extend feeder lines within the subdivision under the contract between the parties without advance payment. This contract provided in its pertinent part that the defendant would "construct an electric line to make electric service available to the SKY-HI RETREAT SUBDIVISION."[1]

The trial court, sitting without a jury, heard evidence on September 25 and 26, 1970. The evidence consisted of proof of the execution of the contract in question, as well as various circumstances surrounding its execution. In 1963, a person named Leo Elario, Jr., owned the subdivision in question. Elario sold the subdivision to the plaintiffs in late 1964. Elario entered into a written contract with the defendant for electric service on March 19, 1963 (Exhibit 3 and hereinafter referred to as Elario's contract). This agreement was substantially the same as the written contract executed by the plaintiffs and defendant on January 2, 1965 (Exhibit 6 and hereinafter referred to as the plaintiffs' contract), with the exception of appropriate changes of the parties, the annual minimum amounts and the amounts of the refundable deposit. The contract with Elario provided that the annual minimum was $1,080, with the possibility of reductions if other consumers were served from the line extension. The minimum in the plaintiffs' contract was $840, with the same possibility of reduction. Elario's contract provided for a deposit of $10,000 on account of the cost of constructing the electric line; the plaintiffs' contract, $5,000. Both of these de-

[1]. The complete contract reads as follows: "THIS CONTRACT, made and entered into this 2nd day of January, 1965, between NAVOPACHE ELECTRIC CO-OPERATIVE, INC., a non-profit corporation, Party of the First Part, and GUY PETER DUHAME AND DANIEL L. BLANTON, Parties of the Second Part.
WITNESSETH:
That the Party of the First Part hereby agrees to construct an electric line to make electric service available to the SKY-HI RETREAT SUBDIVISION.
In consideration of the above, the Parties of the Second Part agree:
1. To furnish Party of the First Part an easement on property to be designated by mutual agreement for construction of electric lines and maintenance thereof.
2. Clear all rights-of-way on subdivision, as per co-operative requirements.
3. The annual minimum shall be $840 per year for a period of ten years, provided if and when there should be other consumers hereafter served from this line extension, the annual minimum will be reduced on an overall cost to serve basis. The new consumer shall be charged the proportionate share of the original cost of the electric line and the second party will be rebated an amount equal to this proportional cost.
4. That the Parties of the Second Part have on deposit with the Party of the First Part the sum of FIVE THOU-SAND DOLLARS ($5,000), on account of the cost of facilities required to make service available to SKY-HI RETREAT SUBDIVISION. Such deposit shall be returnable to the Parties of the Second Part in the form of a refund at the end of each year in the amount of fifty per cent (50%) of the gross annual electrical revenue over and above the minimum specified in this agreement. No refund shall be made of any portion of the deposit remaining upon termination of this agreement.
5. The Party of the First Part shall use reasonable diligence to provide a constant and uninterrupted supply of electric power and energy; but if such supply shall fail or be interrupted, or become defective, through act of God, or the public enemy, or by accident, strikes, labor troubles, or by action of the elements, or inability to secure rights-of-way, or other permits needed, or for any other cause beyond the reasonable control of the Party of the First Part, the Parties of the Second Part shall not be liable therefor.
This contract shall extend to and bind the heirs and successors in interest of the parties hereto.
IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their duly authorized representatives as of the day and year first above written."

posits were refundable at the end of each year in an amount equal to 50% of the excess of the revenue from the consumers in the subdivision over the annual minimum. The $5,000 deposit referred to in the plaintiffs' contract had been assigned to them by Elario and his wife on October 10, 1964 (Exhibit C).

The dispute in the instant case arose in May of 1967, when the plaintiffs requested the defendant to extend electric service into the subdivision to certain lot owners. Defendant responded to this request by informing the plaintiffs that certain funds in aid of construction would be required for the extension. The defendant's position was that its line extension policy (Exhibit E) dated September 15, 1965, required a contribution or deposit in aid of construction, in that the requested line extensions were not feasible and were in excess of 330 feet.[2]

There was proof at the trial below that the defendant had constructed electric lines over 330 feet in length within the subdivision here in 1963 while Elario owned it and prior to the plaintiffs' purchase of it, at no cost to either the subdivider or the ultimate consumers except for monthly minimum agreements.[3] The defendant's general manager explained that these earlier line extensions had been under an earlier line extension policy (Exhibit 18) and that the earlier extensions had been feasible under the earlier policy.[4]

There were numerous exhibits in evidence at the trial, including the Elario contract, the plaintiffs' contract, the 1964 line extension policy (Exhibit 18, *see*, note 4, supra), and the 1965 line extension policy (Exhibit E, *see*, note 2, supra). The other exhibits will be described, as appropriate, in dealing with the plaintiffs' contentions on appeal.

Prior to the proceedings in the trial court, the plaintiffs applied to the Arizona Corporation Commission for relief. The Corporation Commission ordered the plaintiffs to deposit with the defendant an amount of money in aid of construction ($3,510), and ordered the defendant to construct the power lines within the subdivision. These orders were complied with.

The plaintiffs filed a complaint for a refund of the amount deposited with the defendant, as well as two other sums alleged to be due them as rebates under the contract and for declaratory judgment. The rebates were on power sales within the subdivision in excess of a minimum stated in the contract.

The trial court entered an "Order for Judgment" in favor of the defendant on December 19, 1969, which stated that it was not intended to be a finding of fact and conclusion of law, but merely to give the parties the reasons for the trial court's ruling. This order directed defendant to prepare a formal judgment. The order for judgment indicates that the trial court con-

---

2. The 1965 line extension policy (Exhibit E) provided that the defendant would construct a line extension of 330 feet for a monthly minimum of $2.50, or, if the extensions requested were over 330 feet, under one of four plans, briefly described as follows: (1) sufficient minimum use agreements to insure feasibility, i. e., a 15% return on the cost of the line extension; (2) non-refundable contribution in aid of construction; (3) partial non-refundable contribution; and (4) completely refundable contribution with refunds based on 50% of the excess revenues over agreed minimums.

3. One of the four consumers who signed an agreement and who was served by that

line extension was the plaintiff Blanton (Exhibit A).

4. The earlier line extension policy (Exhibit 18) provided that "electric service will be supplied *within subdivisions* under one of the following plans. * * *" (Emphasis added) The three plans can be easily described as: (1) No cost to subdivider or consumer, if feasible, meaning a 15% per year return from minimum agreements on the defendant's investment; (2) A non-refundable contribution in aid of construction; and (3) A refundable advance payment or contribution as an aid to construction. This exhibit was stamped as approved for filing with the Arizona Corporation Commission on June 18, 1964.

-sidered the language of the contract, "an electric line" which would make power "available to" the subdivision, to mean a "line extension up to the subdivision and not within." The trial court pointed out that the words "an electric line" are in the singular. The contract here uses the language "electric lines" in a description of easements for construction within the subdivision which the plaintiffs must furnish to the defendant. The trial court also appears to have attached significance to use in the contract of the words "make electric service available to" the subdivision, as meaning only making of electric service "utilizable within the subdivision." The trial court noted in its order for judgment that the apparently different treatment of the earlier and later subdividers (Elario and the plaintiffs, respectively) was explained by the difference in the line extension policies in effect at the time of each respective line extension within the subdivision, as well as the differences in feasibility shown by the proof.

After entry of judgment for the defendant, the plaintiffs perfected this appeal. They have presented numerous contentions in this case.

▪ First, the plaintiffs urge that since the defendant had constructed line extensions within the subdivision prior to May, 1967, and did not require contributions in aid of construction for them, the plaintiffs' contract [5] should be interpreted to mean that defendant was obligated to construct the requested line extensions within the subdivision without contributions in aid of construction. Plaintiffs cite Restatement of Contracts § 235(e) as authority for this contention. *See*, Valentine v. Shepherd, 19 Ariz. 241, 168 P. 643 (1917). The gist of § 235(e) is that conduct of the parties subsequent to execution of the contract indicates the interpretation placed upon the contract, provided that interpretation is reasonable.

The proposition stated by plaintiffs is correct, but here there was proof of why the earlier line extensions were built without requiring contributions in aid of construction. This proof was the defendant's general manager's explanation that the earlier line extensions were feasible under the 1964 line extension policy and required no contribution in aid of construction. These minimum use agreements were signed by the consumers whom the earlier line extensions served.[6] Without this explanation, the subsequent conduct of the parties would seem persuasive on the plaintiffs' contention, but in light of the explanation this contention is not reasonable and without merit.

The plaintiffs contend that Pembroke Park Lanes, Inc. v. High Ridge Water Co., 178 So.2d 37 (Fla.App.1965), requires this court to hold that the contract obligated the defendant to pay for the expense of the line extensions here. In the *High Ridge* case the contract was given an interpretation based on the conduct of the parties and on what was reasonable. The interpretation urged by the plaintiffs would not be reasonable here.

▪ The plaintiffs next urge that certain letters [7] from the defendant, Elario's contract (Exhibit 3) and the plaintiffs' contract (Exhibit 6), taken together, indicate that the defendant was obligated to furnish electrical service within the subdivision. Upon examination of each of these items, we find no merit in this contention.

Exhibit 4 is a letter from defendant's Member Service Director to "Sky Hi Retreat" dated May 24, 1965, which stated:

"The Navopache Electric Cooperative has a three phase line constructed to, and across a portion of, Sky Hi Retreat Subdivision.

This three phase line has adequate capacity to supply the water system and all of the lots within the subdivision.

---

5. This contract (Exhibit 6) for all intents and purposes is the same as Elario's contract (Exhibit 3) under which these earlier line extensions were made.

6. As pointed out in note 3, supra, one of these consumers was plaintiff Blanton.

7. These letters are Exhibits 4, 5, 7, 11, 12, 15, 16 and 17.

Electric distribution lines have been built to supply many of the lots at Sky Hi Retreat, and additional electric lines will be constructed as requests for electric service are received from lot owners within the subdivision.

Navopache receives great satisfaction from being in a position to serve such an area as Sky Hi Retreat."

It is obvious that this letter could be considered as persuasive of plaintiffs' argument here, but it should be noted that there is no mention of who would pay for line extensions. This letter appears to us to be just as persuasive of the position taken by defendant, when veiwed in the context of all the other proof here. To decide otherwise would violate the proviso of Restatement § 235(e), supra, that an interpretation of a contract based on subsequent conduct be reasonable. Further, this letter was not directed to any particular person and does not indicate whether or not it was in reply to or a confirmation of any other letter or conversation. This item does not require that we reverse the trial court.

Exhibit 5 is a letter to the plaintiff Duhame from the office manager of the defendant, dated November 10, 1964, and likewise contains no reference to the payment of expense of line extensions. This letter merely states that Elario owed the defendant as of October 31, 1964. This letter was apparently in response to a letter from Duhame, but Duhame's letter is not in evidence. It is not persuasive in considering the contract at bar.

Exhibit 7 is a letter with enclosures from the defendant dated January 19, 1967, which has no probative value, but simply stated the amount of refunds for 1966 paid the plaintiffs as their 50 percent of the excess of electric sales over their yearly minimum of $840.

Exhibit 11 is a letter of the same character but has to do with a computation of sales in three different sections of the subdivision. It has no evidentiary value.

Exhibit 12 is a letter from defendant's general manager to plaintiffs' lawyer dated January 31, 1968. This letter is apparently in response to a letter from plaintiffs' lawyer to defendant, but this latter letter is not in evidence. The letter in evidence sheds no light on the question of the cost of line extensions. It does, however, give the plaintiffs a choice in the manner of paying for the line extension, as it was decided they were entitled to by the trial court, under either the 1965 line extension policy (Exhibit E, see, note 2, supra), or under the subdivision policy (Exhibit F). Assuming, arguendo, at this point that the trial court was correct in deciding that the plaintiffs must pay the expense of the construction requested, it is our opinion that the plaintiffs have the choice outlined by Exhibit 12 as to the manner of paying this expense.[8] Plaintiffs' contention that the trial court found that they are bound by the 1965 line extension policy rather than the subdivision policy is grounded upon a mistake and without merit.

The letter which is Exhibit 17 is addressed to a lawyer representing Elario (the former owner of the subdivision, as explained above) and dated December 6, 1963. It was written in response to this lawyer's letter of December 4, 1963 (Exhibit 21), by a former manager of the defendant. This letter has to do with certain misunderstandings between defendant and Elario, none of which has any bearing on the question before us. The plaintiffs quote a portion of this letter out of context and urge that it is persuasive on the question here.

The plaintiffs next urge that Exhibits 15 and 16, two letters from the defendant to the plaintiffs, indicate that at least part of the subdivision was "covered" by contract, i. e., that the plaintiffs' contract included the cost of line extensions at least to a

---

8. The trial court concluded that the line extension here would "be controlled by the application of Defendant's line extension policy or policies." Abstract of Record, Vol. I, p. 61.

part of the subdivision.[9] First, these letters are not persuasive of the plaintiffs' contention here but rather are consistent with the position of the defendant, i. e., that the plaintiffs' contract only required that the defendant construct a line to the boundary of the subdivision at its own expense. One of the matters discussed in these letters was whether the plaintiffs' contract dealt with both the portion of the subdivision east of certain railroad tracks and that portion west of these tracks. The trial court apparently found that the plaintiffs' contract obligated the defendant to make electric service available to the whole subdivision (both east and west portions). The plaintiffs' contentions in this regard need not be considered as the question was decided by the trial court favorably to them.

The plaintiffs next urge that a monthly minimum agreement for electric power signed in 1963 by plaintiff Blanton (Exhibit A, *see,* note 3, supra) does not support the finding of the trial court but rather supports their contention that the expense of the line extension was the obligation of the defendant under the plaintiffs' contract. As pointed out by plaintiffs' brief, "The language of that contract contains no reference whatsoever to the cost of line extension." This exhibit is not persuasive of plaintiffs' argument, but from it one might infer that plaintiff Blanton knew or should have known that a line extension policy existed at that time, required the minimum use agreement he signed and controlled payment of the expense of line extensions. This 1963 agreement was one of four signed together by Elario, Blanton, and another person in order to make a line extension feasible under the existing line extension policy (Exhibit 18, *see,* note 4, supra).

■ The plaintiffs next contend that the defendant's conduct prior to May, 1967 (when the dispute here arose), requires application of the principle of estoppel. The

defendant responds that the plaintiffs have not pleaded estoppel, as required by Rule 8(d), Rules of Civil Procedure, 16 A.R.S., to the effect that the issue is not before the court.[10] The plaintiffs do allege an inconsistency of conduct on the part of the defendant in their complaint. The elements of estoppel are:

"(1) conduct by the party to be estopped by which he intentionally or through culpable negligence induces another to believe and have confidence in certain material facts;

(2) action by the party so induced in reliance, justifiably taken, upon the apparent state of the facts; and

(3) injury to the party so induced which is caused by his reliance. [Citation omitted.]" Robbins Investment Co. v. Green Rose Associates, Inc., 8 Ariz. App. 596, 600, 448 P.2d 440, 444 (1968).

The *Green Rose* case holds that there is no estoppel if any of these elements are lacking. Here, without deciding whether the first element has been established, it is clear to this court that any reliance by the plaintiffs on the conduct alleged to have been relied upon was not justified. Plaintiffs urge that they relied on Exhibit 5 (discussed supra), but that letter contains nothing on which they could have justifiably relied. The estoppel contention of plaintiffs is without merit.

■ There has been extensive treatment of the question of interpretation of contracts in Arizona, all to the effect that the paramount purpose is to determine the intent of the parties at the time the contract was made. E. g., Sam Levitz Furniture Co. v. Safeway Stores, Inc., 105 Ariz. 329, 464 P.2d 612 (1970); Goodman v. Newzona Investment Co., 101 Ariz. 470, 421 P.2d 318 (1966); Rental Development Corp of America v. Rubenstein Const. Co., 96 Ariz. 133, 393 P.2d 144 (1964). The

9. The plaintiffs' opening brief at p. 18 misquotes Exhibit 15, p. 3.

10. Since a decision of whether the question is before the court is not necessary to a determination here, in that this contention may be disposed of on other grounds, we do not decide this question.

*Newzona* case teaches that this intent "* * * as ascertained by the language used [in the contract], must control the interpretation of a contract." The *Sam Levitz* case is similar to the case at bar and we think controlling in that there the parties disagreed on the meaning of the word "purchase", while here there is disagreement over the language "to make electric service available to the SKY-HI RETREAT SUBDIVISION." As stated by our Supreme Court in the *Sam Levitz* case, quoting Corbin:

> "' * * * A party should be permitted to determine the operative meaning of the words of agreement by proving that both parties so understood them, or *that he so understood them and the other party knew that he did,* or that he so understood them and the other party had reason to know that he did.' Corbin on Contracts, Vol. 3 § 538, page 59." 105 Ariz. at 331, 464 P.2d at 614. (Italics ours)

The record in the instant case reflects that, as in the *Sam Levitz* case, the plaintiffs knew or should have known what the language in question meant, what the defendant was obligated to do, i. e., construct the electric line to the boundary of the subdivision

We hold that the contract here was correctly interpreted by the trial court. The trial court made findings of fact to the effect that the contract in question was entered into by the parties and that the defendant refused to make an extension of electric feeder lines within the subdivision, without a contribution in aid of construction and without the execution by the plaintiffs of a subdivision contract. These findings are amply supported by competent evidence in the record and cannot be disturbed on appeal. Sam Levitz Furniture Co. v. Safeway Stores, Inc., supra. The trial court's conclusions of law, in part, were to the effect that the contract entered into by the parties required the defendant to construct an electric power line only to the boundary of the subdivision. We are in agreement with the trial court's reasoning as to the meaning of the contract, which was set out in its "order for judgment" (discussed supra). This conclusion logically follows from the facts as found by the trial court and must be upheld. Sam Levitz Furniture Co. v. Safeway Stores, Inc., supra.

◼ While not presented in their briefs, the plaintiffs contended at oral argument that the parties here could not have meant "to the subdivision" in their contract since the electric line was already "to the subdivision" when the contract was entered into. Therefore, the $840 charge and $5,000 deposit must have been to extend the line *within* the subdivision, plaintiffs urge.

Of course, as pointed out above, the $840 is only a minimum amount of revenue which plaintiffs guaranteed. If power revenue exceeded this amount, plaintiffs would not be called upon to pay any of it, but could receive one-half of the yearly excess as refunds, up to the amount of $5,000. Also, as pointed out above, the plaintiffs made no deposit, but merely assumed Elario's rights in the deposit here, which had been made by Elario, under an assignment made by Elario to plaintiffs. Elario's contract stated that it would "extend to and bind the heirs and successors in interest of the parties hereto," as did plaintiffs' contract.

Further in this regard, it is our opinion that the whole problem here is that the plaintiffs view their contract as one having to do with the extension of electric lines, while in reality their contract has to do with providing, furnishing, or making available, electric power to the consumers living within or on the subdivision. As we decide above, the contract used here contemplated a line extension only to the boundary of the subdivision. The construction of the electric line here was only the *means* of supplying power to these consumers, not the subject of the contract, i. e., the supplying of electric power. This argument of plaintiffs is without merit.

As to the rebate granted plaintiffs in the trial court, the defendant has not contested the propriety of them on appeal so we have nothing to decide in that regard.

Affirmed.

HOWARD and HATHAWAY, JJ., concur.

Note: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.